District Court, D. Delaware.
April 12, 1939.

Arthur G. Logan (of Marvel, Morford & Logan), all of Wilmington, Del., for plaintiffs.

Clarence A. Southerland (of Ward & Gray), all of Wilmington, Del., and Douglas M. Moffat and William D. Whitney (of Cravath deGersdorf, Swaine & Wood), all of New York City, for defendant.

NIELDS, District Judge.

This is an action brought under section 4 of the Clayton Act, 15 U.S.C.A. § 15, to recover treble damages for injuries sustained by Inland Gas Corporation to its business and property by reason of acts of Columbia Gas & Electric Corporation forbidden in the anti-trust laws of the United States and in violation of section 7 of the Clayton Act, 15 U.S.C.A. § 18.

The affirmative defense of "Statute of Limitations" was heard pursuant to stipulation, upon motion to dismiss instead of by answer.

Defendant filed its motion

"To dismiss the complaint herein for failure to state a claim upon which relief can be granted on the ground that the cause of action, if any, alleged therein against

the defendant did not accrue within a period of three years prior to the commencement of this action."

The parties stipulated:

"(1) The motion of the defendant [above recited] shall be heard and determined by the court prior to the filing herein by the defendant of any responsive pleading with the same effect as though the said motion presented a defense falling within the terms of Rule 12–B of the 'Rules of Civil Procedure for the District Courts of the United States'.

"(2) The parties agree that the alleged right of action sued upon in this cause accrued not later than January 1, 1931, and if, upon hearing the said motion, the court shall be of the opinion that the said action is barred by any applicable statute of limitations, the said motion shall be granted; otherwise, it is expressly agreed that the defendant may file its answer or any further motion in the cause which it may desire to make, and the time within which the defendant shall file its answer or any such motion shall be fixed by the court."

Section 7 of the Clayton Act, 15 U.S.C.A. § 18, forbids the acquisition of the capital stock of a competitor under certain circumstances: "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce".

Section 4 of the Clayton Act, 15 U.S.C.A. § 15, authorizes suits for damages under the federal anti-trust laws: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee".

Section 721, U.S.R.S., 28 U.S.C.A. § 725, makes the Delaware statute of limitations applicable to a suit brought under section 4 of the Clayton Act. It provides:

"The laws of the several States, except where the Constitution, treaties, or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply."

The Delaware statute of limitations, Revised Code of Delaware, 1935, section 5129, provides: "No action of trespass, no action of replevin, no action of detinue, no action of debt not found upon a record or specialty, no action of account, no action of assumpsit, and no action upon the case shall be brought after the expiration of three years from the accruing of the cause of such action; subject however, to the provisions of the four next following sections."

### Complaint.

The complaint alleges:

That on November 6, 1930, Columbia Gas & Electric Corporation (hereinafter referred to as "Columbia") while engaged in the production, transmission, distribution and sale of natural gas in interstate commerce, acquired indirectly a majority of the outstanding common stock of Inland Gas Corporation (hereinafter referred to as "Inland") also engaged in such commerce. That the effect of the acquisition was to lessen competition between Inland and Columbia and create a monopoly in violation of section 7 of the Clayton Act. Like allegations are made respecting Kentucky Fuel Gas Corporation (hereinafter referred to as "Kentucky Fuel").

That the principal activities of Columbia are in the states of Indiana, Ohio, West Virginia, Kentucky, Pennsylvania and New York. It controls through its subsidiaries 25% of the total mileage of natural gas pipe lines operating within the United States. It has transported and sold 42% of the natural gas produced in the eastern part of the United States. September 17, 1930, Columbia acquired control of Panhandle Eastern Pipe Line Company. In 1936 Columbia through a subsidiary built an extension of the Panhandle Eastern Pipe Line Company to the city of Detroit and arranged for the sale of gas therein.

That on March 30, 1927, Inland was incorporated. It acquired the property and business of two companies engaged in the production and sale of natural gas and secured gas reserves in eastern Kentucky. In order to have sufficient gas reserves to justify building a natural gas transmission

line from eastern Kentucky to Ashland, a distance of 110 miles, Inland had assigned to it contracts for the purchase of natural gas from reserves in eastern Kentucky owned by other corporations. These assignments were:

(1) December 15, 1927, there was assigned to Inland a contract dated November 15, 1927, between Hamilton Gas Company (hereinafter referred to as "Hamilton") and Howe Oil & Gas Company. The contract provided that Hamilton would sell and Howe would buy natural gas produced from certain properties controlled by Hamilton in eastern Kentucky for a period of 10 years starting June 1, 1928, and so long thereafter as gas could be produced from Hamilton properties in commercial quantities.

(2) There was also assigned to Inland a contract dated November 5, 1927, between Piney Oil & Gas Company (hereinafter referred to as "Piney"). This contract provided that Piney would sell and the vendee would purchase from properties controlled by Piney in eastern Kentucky 4,000,000 cubic feet per day of natural gas until a certain contract had terminated and thereafter 10,000,000 cubic feet per day. This contract was for a period of 20 years from June 1, 1928, and so long thereafter as gas was produced from properties of Piney in commercial quantities.

(3) There was also assigned to Inland a contract dated October 12, 1927, between United Carbon Company and Alfred Howell. This contract provided that United Carbon Company would sell and the vendee would buy from properties controlled by United Carbon Company in eastern Kentucky 8,000,000 cubic feet of natural gas per day and at vendee's option all of United Carbon Company's production in excess of 8,000,000 cubic feet per day and up to 12,000,000 cubic feet per day. Carbreath Gas Company (hereinafter referred to as "Carbreath") succeeded by mesne assignments to all the rights of United Carbon Company as vendor in said contract.

That to acquire the properties and build transmission lines and have working capital, Inland issued $4,400,000 of first mortgage bonds, $1,500,000 debentures and $400,000 of notes. The bonds and debentures were sold to the general public. The notes were sold to American Fuel and Power Company (hereinafter referred to as "American"). Inland has outstanding $4,254,700 in bonds plus interest from June 1, 1930; $1,450,000 of debentures plus interest from June 1, 1930; and $400,000 of notes plus interest from July 2, 1930.

In 1928 the 110 mile pipe line was completed and Inland took deliveries from Hamilton, Piney and Carbreath in accordance with the above mentioned contracts but failed to earn its fixed charges in either 1928 or 1929.

That on July 17, 1928, the owners of the stock of Inland and Kentucky Fuel caused American to be incorporated and transferred to it all of the common stock of Inland and Kentucky Fuel in exchange for its common stock. American has held said shares of Inland and Kentucky Fuel at all times since the transfer thereof to it. In 1928 Inland had a net loss of $491,598.74 and in 1929 a net loss of $434,951.13.

In the Spring of 1929 American issued $2,000,000 of notes and arranged for the issuance of an additional $2,000,000. With the proceeds of these notes American made loans to Inland and Kentucky Fuel, acquired additional natural gas acreage and paid the cost of building a gas transmission line from Ashland, Kentucky, to Huntington, West Virginia. After American had issued the $2,000,000 of notes the bankers refused to purchase the $2,000,000 additional.

That prior to 1930 Hope Engineering Company had managed the properties of Inland and Kentucky Fuel and other subsidiaries of American. Hope employed an organization to secure contracts in the city of Detroit for the sale of gas. These contracts were contingent upon obtaining sufficient consumer contracts to an amount of 70,000,000 cubic feet per day upon an annual basis. Hope calculated that sufficient gas could be sold in Detroit to justify a large pipe line being built from Kentucky to Detroit to transmit gas produced and controlled by Inland and Kentucky Fuel. Hope formed a syndicate consisting of Hope and others for the purpose of acquiring control of American and its subsidiaries and constructing a major natural gas transmission line to Detroit.

That on March 22, 1930, the syndicate purchased a controlling stock interest in American for $500,000. Thereupon Northern Gas Company was organized to build and operate the gas pipe line from Kentucky to Detroit. The syndicate planned that the gas called for under the contracts with Hamilton, Piney and Carbreath should

be transmitted through the proposed pipe line to Detroit. All gas of Inland and Kentucky Fuel in excess of the amount needed to serve their customers in Kentucky, West Virginia and Ohio was to be transmitted for sale in Detroit in quantities and at prices to Inland and Kentucky Fuel sufficient to give them earnings to pay all fixed charges and sinking fund requirements and to pay dividends on their stock for the retirement of the $2,000,000 of outstanding American notes. Additional gas needed would be taken from the Howe Oil & Gas Company acreage or other properties which had been placed under option.

That had not the plans of the syndicate been interrupted by Columbia the said pipe line would have been built and the gas called for by the contracts Inland had with Hamilton, Piney and Carbreath would have been transmitted to and sold in Detroit without any loss to Inland and Inland would have sold its excess gas at prices sufficient to pay its fixed charges, the sinking fund requirements on its outstanding bonds and debentures and dividends on its stock in an amount sufficient to give American net earnings of at least $1,000,000 and to discharge the deficit, accumulated prior to the completion of said line and to discharge any and all other obligations which it had assumed.

That in 1928, 1929 and 1930 Inland was not able to sell a sufficient amount of gas to meet its fixed charges or the sinking fund requirements on its outstanding bonds and debentures or to pay dividends on its stock. After December 2, 1930, the receiver of Inland and the trustees thereof were forced to operate the business of Inland at a loss at all times.

That the mortgages under which the bonds and debentures of Inland were issued provided that the trustees could upon the request of the holders of 25% in principal amount of the securities declare that a default existed and that the entire principal of the debt was due. Thereupon foreclosure proceedings would have to be brought. Columbia between January 1, 1930, and April 1, 1930, purchased 27% of all the outstanding bonds of Inland. At the close of 1930 Columbia had purchased 35% of the Inland bonds.

That in March, 1930, the syndicate had agreed to furnish money to American to take care of the sinking fund requirements of the bonds of Inland. The syndicate also planned to construct the natural gas pipe line from Kentucky to Detroit and put the same in operation before April 1, 1931, which would have assured Inland of sufficient earnings to meet all fixed requirements on its bonds and debentures.

That knowledge of the syndicate plan caused Columbia to stop buying bonds until it acquired stock control of Inland. Thereupon Columbia agreed to purchase the syndicate's stock control of American and thus indirectly stock control of Inland and also the stock of the corporations which had been organized to carry out the program in connection with the pipe line. This purchase was contingent upon the acquisition by Columbia of Panhandle Eastern Pipe Line Company. That on September 17, 1930, Columbia acquired control of Panhandle Eastern and immediately thereafter agreed with the syndicate to purchase their interests. The price paid by Columbia to the syndicate was the total amount the syndicate had invested in the project plus $350,000. November 6, 1930, Columbia's nominees were placed upon the boards of American and all of its subsidiaries. Thus Columbia acquired control of Inland. Having stock control of Inland and of all other corporations used in connection with the building of the pipe line to Detroit, Columbia on November 6, 1930, stopped all work upon the project.

That prior to October 9, 1930, a company organized by the syndicate had petitioned the Detroit Common Council for a franchise to lay pipe lines in the streets of Detroit and to sell natural gas to industrial customers in Detroit. The day following, Columbia passed a resolution calling for an extension of its natural gas pipe line from Toledo to Detroit. Having secured control of American and its subsidiaries Columbia abandoned the building of the proposed pipe line from Toledo to Detroit.

That on November 25, 1930, the executive committee of the board of directors of Columbia passed a resolution providing that Inland should be placed in receivership. December 2, 1930, a bill of complaint was filed for the appointment of a receiver of Inland in the District Court of the United States for the Eastern District of Kentucky. A consent answer was filed and W. E. Lockhart was appointed receiver.

That on October 14, 1935, a petition was filed in the Kentucky court for the appointment of a trustee of Inland under the provisions of section 77B of the Bankruptcy

Act as amended, 11 U.S.C.A. § 207. Lockhart was appointed trustee. May 5, 1937, Ben Williamson, Jr., was appointed cotrustee with Lockhart. June 30, 1937, Lockhart resigned and Ben Williamson, Jr., became sole trustee of Inland.

That after Lockhart was appointed receiver the officers of Hamilton and Piney inquired of Columbia as to the status of their contracts for selling gas to Inland. They were assured that Columbia would respect the contracts and cause the Inland receiver to take the gas provided therein.

To prevent Hamilton and Piney from cancelling their contracts, an agent of Columbia stated that Columbia would arrange to have contracts entered into by certain of its subsidiaries with Hamilton and Piney whereby natural gas in large quantities would be purchased from Hamilton and Piney from properties not covered under the Inland contracts. Relying upon this promise neither Hamilton nor Piney cancelled its contract with Inland. By this method Columbia was enabled to prevent Hamilton and Piney from making any contracts for the sale of gas from acreage controlled by them. Although the promises of Columbia were made in December, 1930, no contracts were made until the Fall of 1931. In November, 1931, contracts were made between Piney and Hamilton on the one side and Warfield Natural Gas Company, a subsidiary of Columbia, on the other, to sell their natural gas to Warfield. By this method Columbia was able to prevent Hamilton and Piney from making contracts for the sale of gas in competition with Columbia. December 18, 1931, Lockhart notified Hamilton and Piney that as receiver of Inland he intended to disaffirm the Hamilton and Piney contracts. Both Hamilton and Piney considered this an attempt on the part of Columbia to jeopardize their interest. If the receiver refused to take gas under the contract with Inland, Piney and Hamilton could not sell their gas. They complained to Columbia that it was unfair for the receiver to disaffirm their contracts. Columbia agreed and the contracts were not disaffirmed. The receiver of Inland was unable to market all of the gas called for under the Hamilton and Piney contracts and also to use the gas from the Inland properties. Therefore he was forced to breach the terms of the Hamilton and Piney contracts as he could not take the gas called for therein. In the Spring of 1932 the receiver refused to take any gas from Hamilton or Piney under said contracts although he did not disaffirm the Piney contract until November, 1932, and the Hamilton contract until December, 1933.

That due to the fact that the receiver did not disaffirm the Hamilton and Piney contracts immediately upon his appointment as receiver due to instructions from Columbia, Hamilton and Piney asserted priority claims in the proceedings under section 77B of the Bankruptcy Act, as amended, for damages for gas not taken. The total amount claimed by Hamilton is $3,047,574.74 with interest from November 20, 1935. The damages claimed by Piney are $1,465,603.20 with interest from December 13, 1933. Priority of said claims has been denied by the Kentucky court and appeals have been taken and are undisposed of.

That the contract between Inland and Carbreath was not disaffirmed by Lockhart until July 9, 1932, although he was unable to purchase and resell gas provided for therein. The contract was not disaffirmed because Columbia was unwilling. Claims have been filed by Carbreath in the Inland proceedings in Kentucky in the sum of $963,169.30 with interest, and in the further sum of $804,568.83.

The complaint alleges that said claims of Hamilton, Piney and Carbreath filed in the reorganization proceedings in the Kentucky court represent damages to Inland and the receiver thereof occasioned by Columbia in preventing natural gas being transmitted and sold in competition with the Columbia system. That but for the acts of Columbia, all the gas called for under the three contracts would have been sold in Detroit without any loss to Inland and without Inland having been forced to breach said contracts.

The complaint further alleges that in March 1930 having acquired 25% of the outstanding bonds of Inland and Kentucky Fuel the Syndicate agreed to furnish money to take care of the sinking fund requirements of the bonds of Inland until April 1, 1931. This arrangement was interrupted by Columbia to the damage of Inland in the sum of $60,000 with interest thereon from March 1, 1931, of $27,000. Also that on December 22, 1930, Lockhart, receiver of Inland, paid from the receivership estate without court authority to Warfield Natural Gas Company $7,418.85 pursuant to instructions from Columbia resulting in damage to Inland in

the sum of $7,418.85, with interest from December 22, 1930, of $3,377.79.

The full amount of the damages alleged to have been sustained by Inland by reason of acts of Columbia in violation of the anti-trust laws may be summarized:

1. Claims for damages asserted in the reorganization proceedings of Inland under section 77B of the Bankruptcy Act in the United States District Court for the Eastern District of Kentucky—
   (a) Claim of Hamilton for damages for gas not taken under contract between Hamilton and Inland ........................... $ 3,047,574.74
   Interest from November 20, 1935 ... 499,802.26
   (b) Claim of Piney for damages for gas not taken under contract between Piney and Inland...... 1,465,603.20
   Interest from December 13, 1933 ... 410,368.89
   (c) Claim of Carbreath for damages for gas not taken under contract between Carbreath and Inland ........................... 963,169.30
   Interest from September 30, 1935 ... 166,146.70
   (d) Further damages sustained by Inland by virtue of not being able to carry out contract with Carbreath ....................... 804,569.83
2. Damages to Inland because "unable to sell gas for delivery and resale in Detroit * * * in sufficient quantities and at prices which would have given it [Inland] earnings sufficient to pay all the fixed charges, and sinking fund requirements and thereby discharge and retire its funded debt and pay dividends"—
   (a) Inland's outstanding bonds.... 4,254,700.00
   Interest from June 1, 1930...... 2,051,119.95
   (b) Outstanding notes and debentures ........................... 1,850,000.00
   Interest from June 1, 1930...... 944,791.65
   (c) Dividends (never earned or declared) ........................... 1,000,000.00
3. Damage from interruption of payment by syndicate .................... 60,000.00
   Interest from March 1, 1931.......... 27,000.00
4. Unauthorized payment by receiver of Inland to Warfield for drilling operation ................................. 7,418.85
   Interest from December 22, 1930..... 3,377.79
   _____
   $17,555,642.16
   ===========

   Triple damages claimed .......... $52,666,926.48
   Counsel fee......... 500,000.00

## Law.

This action for triple damages under the federal anti-trust laws is an action upon the case. In such an action the statute of limitations applicable is that of the state where the action is brought. In this case the Delaware statute applies. The parties having stipulated that the cause of action, if any, accrued more than three years before the institution of the suit, this action is barred by section 5129 of the Revised Code of Delaware, 1935.

The circuit court of appeals for this circuit has determined that a triple damage action under the federal anti-trust laws is an action on the case. The court said:

"In this case, an action to recover damages for violation, by the defendant, of the Sherman Anti-Trust Act (15 U.S.C.A. §§ 1–7, 15 note) the decisive factor is the several years' delay of the plaintiff in bringing this suit. In point of fact, such suit was not brought for over eight years, and the question is whether it was barred by the New Jersey statute of limitations (3 Comp.St.N.J.1910, p. 3162, § 1 [R.S.N.J. 1937, 2:24–1]). The question arises in this way. The New Jersey statute of limitations, which it is conceded governs, limits actions on the case to six years. The plaintiff contends his suit is not an action on the case; the defendant says it is. The court below held with the defendant and dismissed the suit. Thereupon plaintiff took this appeal.

"Confining ourselves to the statutes of limitations of the states in this circuit, we note that the acts of New Jersey and Pennsylvania are (3 Comp.St.N.J.1910, p. 3162, § 1; 12 P.S.Pa. § 31), so far as pertinent to the question here involved, the same, and both follow the British statute of James I in limiting actions of case to six years. * * *

"This application of the statutory limitations to an action of case brought for damages under the Sherman Act has arisen in cases in this circuit. By reference to Buckeye Powder Co. v. Du Pont de Nemours Powder Co. (C.C.A. [3 Cir.]) 223 F. 881; Id., 248 U.S. 55, 39 S.Ct. 38, 63 L.Ed. 123, it will be seen that on September 18, 1911, an action similar to the present one was brought in the District of New Jersey. The alleged wrongs were committed from 1903 to the date of the suit. The trial judge held that the plaintiff was barred by the New Jersey statute of limitations as to all damages suffered before September 18, 1905, and left to the jury to decide whether any damage was proven during that six years' period. The jury found for the defendant. On appeal by the plaintiff, this court (223 F. 881) affirmed the judgment, as did also the Supreme Court (248 U.S. 55, 39 S.Ct. 38, 63 L.Ed. 123). * * * Later, in a like case, the limitation of the Pennsylvania statute, which, as stated above, was substantially

the same as the New Jersey one, was held to control: Bluefields S. S. Co. v. United Fruit Co. (C.C.A. [3 Cir.]) 243 F. 1, 20, dismissed 248 U.S. 595, 39 S.Ct. 136, 63 L. Ed. 438. In this court's opinion it was said: 'The only question is whether the six year limitation of the Pennsylvania Act [12 P.S. § 31] was properly applied. * * * We are of opinion .that the defendant [should be plaintiff] did not suffer from error in having applied to its case the six year limitation of the Pennsylvania Act.' These cases were followed in Shelton Electric Co. v. Victor Talking Machine Co. (D. C.) 277 F. 433, 435, a case also arising in this circuit, wherein the trial judge held: 'The case is, however, I think, controlled by Thomson v. Clanmorris (1900) 1 Chancery, 718.' * * * The Sherman Act created a new tort damage right for damages actually suffered, but also imposed a statutory trebling penalty. For this new legislative damage and penalty it created no remedy. But the law, by its flexibility, ·provided for this particular situation a remedy by an action of case, but with that remedy provided, for the protection of defendants, the barrier of a six-year limitation which, as has been said in St. Louis Public Schools v. Walker, 9 Wall. 282, 19 L. Ed. 576, 'is a mere declaration of the law-making power to the plaintiff, that having voluntarily slept so long upon his rights, he shall not now be permitted to assert them, to the injury of individuals and the disturbance of society.'" H. J. Jaeger Research Laboratories v. Radio Corporation, 3 Cir., 90 F.2d 826, 827.

■ An action to recover triple damages under the federal anti-trust laws is based upon a federal statute and enforceable only in a federal court. A federal court has the power to determine the nature of the action. Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 72 F.2d 885. If state courts determine the nature of the action we might have one federal court following a state decision that the nature of the action was case and another federal court following another state decision that the action was in debt. Thus the nature of the action brought under the antitrust laws would depend upon the particular district court in which action was brought. The interpretation of a federal statute is federal business. Federal decisions construing an Act of Congress must be exclusive and uniform.

The federal courts have determined that the action is upon the case. It is bound to be so because the claim is for unliquidated damages. The plaintiff recognizing this to be the law has sought to escape the statute of limitations. He contends that actions such as this could have been brought at common law in the form of debt on a specialty. He contends that the court in the Jaeger case did not consider the applicability of the action of debt. His contention is based upon the following ground: Where a statute prohibits certain conduct. and provides that anyone who violates it shall pay to another an amount to be determined by a court or ·jury the right to recover such amount is enforced by an action in debt on a specialty. He further contends: That the damages awarded by the anti-trust laws is sufficiently definite and certain to be recoverable in debt. That threefold the value of the business destroyed plus the cost of suit is capable of ascertainment by a court or jury and hence at common law and under the Delaware authorities debt would be the proper form of action.

■ Plaintiff's contention that the determination by a court or jury of the amount of an unliquidated claim renders the claim a "liquidated claim" is fantastic if not grotesque. A cursory analysis of the complaint reveals that the plaintiff recognizes that he must found his action upon liquidated sums. Accordingly, he states that Inland's damages from Columbia's violation of the anti-trust laws are the amounts of the claims filed against Inland in a reorganization proceeding in Kentucky from breaches of three express contracts by three sellers of natural gas.

In an effort to find liquidated sums plaintiff also grasps the amounts of Inland's debts and possible future earnings. He assumes that a projected pipe line could have been built to Detroit, that the necessary financing thereof could have been arranged, that the right of way could have been obtained, and the franchise to distribute gas could have been secured. Unknown factors are: How much the pipe line would have cost and how much to operate. Also how much gas Inland could have sold, at what price the gas could have been sold and what the profit would have been and countless other elements which render the amount claimed indeterminate in the highest degree.

If there ever was a case where damages claimed were unliquidated this would seem to be it. The present case with its claim for damages for the breaches of contracts to purchase gas and for damages for not having sold gas in Detroit from a pipe line of several hnndred miles which had never been built and under contracts which had never passed beyond the contingent stage is not a record or specialty upon which an action of debt can be founded.

This action is not upon a specialty. A specialty is a contract under seal. Certain decisions have denominated statutes as specialties which give a right to an ascertained or readily ascertainable money liability upon which an action of debt may be maintained. The distinction between statutes giving a right of action for a specific sum of money and statutes giving an action on the case for damages is well illustrated in an English case. There the action was brought by a stockholder against a director for damages occasioned by a misleading prospectus. The action was brought under the English Directors' Liability Act which gave a right of action against directors who caused the prospectus to be issued. The court discusses whether the six years set by the statute of James for actions on the case or the twenty year period applicable to actions of debt on specialties applied. The court said:

"One must consider what is really the nature of the enactment contained in s. 3 of the Directors Liability Act, 1890. And it seems to me that, though that section does not in form give a new action, though it only says that directors and others 'shall be liable to pay compensation to all persons who shall subscribe for any shares on the faith of the prospectus for the loss or damage they may have sustained by reason of any untrue statement in the prospectus,' yet what the section really does is to give a new action on the case. It creates a new negative duty. The directors or promoters, or whatever other class is included in this section, have cast upon them a new duty in respect of prospectuses and similar documents. Speaking generally, one may say that the Act creates a new statutory duty of accuracy—a new statutory duty to abstain from inaccurate and untrue statements, and then in effect gives a new action on the case to those persons who may have been injured by the neglect of that statutory duty. It seems to me, therefore, that this case is provided for by the stat-ute 21 Jac. 1, c. 16. The action is an action on the case, and if so of course the six years' limitation would apply.

"But it is said that this is not an action on the case, but an action on the statute, and Cork and Bandon Ry. Co. v. Goode, 13 C.B. 826, is relied on. But it must be remembered that there the action was for a statutory debt, and the sole question was whether that debt was, within the terms of s. 3 of the statute of James, 'grounded on a contract without specialty.' It does not seem to me that that decision is really material to the case now before us. Maule J. pointed out that there is a difference between an action which is given by a statute and an action on the statute. Cork and Bandon Ry. Co. v. Goode, 13 C.B. 826, was an action of debt on the statute. And, as I have already said, the only question there really was whether the action came within the words of s. 3 of the statute of James. In the present case it seems to me that a new duty of accuracy in respect of the preparation and issue of prospectuses is created, and an action on the case is given to those persons who are injured by the breach of that duty." Thomson v. Clanmorris, [1900] 1 Ch.Div. p. 718.

New Federal Rules of Civil Procedure.

Plaintiff claims that the new rules of civil procedure providing that "There shall be one form of action to be known as 'civil action'." render inapplicable the three year statute of limitations. Plaintiff argues that the three year statute applies to the form of action, not to the substance thereof. When the new rules went into effect, plaintiff argues that all actions recited in the Delaware statute of limitations being designated by the form thereof are not subject to any limitation except the twenty year presumption: Trespass, debt and assumpsit would be barred like case. The Jaeger case held that an action of debt describes an action by its substance, not merely by its form. Statutes of limitation have been referred to by the United States Supreme Court as statutes of repose designed for a salutary purpose to limit litigation. Thus the Supreme Court said: "As was said of the statute of limitations by Mr. Justice Story (Bell v. Morrison, 1 Pet. 351, 360 [7 L.Ed. 174]): 'It is a wise and beneficial law, not designed merely to raise a presumption of payment of a just debt, from lapse of time, but to afford security from stale demands, after the true state of the transaction may have

been forgotten, or be incapable of explanation, by reason of the death or removal of witnesses.'" Campbell v. Haverhill, 155 U.S. 610, 617, 15 S.Ct. 217, 220, 39 L.Ed. 280.

The substitution in both law and equity of a single form of civil action did not abolish the statute of limitations applicable to actions at law existing before such substitution. It was so held in the federal courts and in the state courts of Colorado, Tennessee, California, Kansas and Missouri, as well as in the courts of England. The exact point has been before the courts many times and has always been decided the same way. When a State changed from common law to code pleading the existing statutes of limitations continued to prevail.

That the new Federal Rules should be construed to have the effect of abolishing all periods of limitation in actions of debt, trespass, assumpsit, case and all other actions mentioned in Section 5129 of the Delaware Code is incredible. If such a result were intended there would have been something explicit on the point in the rules. Nothing of the sort exists. Moreover, plaintiff claims that the new Federal Rules operate retrospectively as to causes of action theretofore barred by the statute. This contention is supported neither by reason nor authority.

The motion to dismiss must be granted.