Jacob **KRESHTOOL**, as Trustee of Transit Freeze Corporation, a corporation of the State of New Jersey, Bankrupt, Plaintiff,

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, and International Longshoremen's Association, Local No. 1694, AFL–CIO, Defendants.**

**Civ. A. No. 2910.**

United States District Court
D. Delaware.

June 15, 1965.

Howard M. Handelman, Wilmington, Del., for plaintiff.

David B. Coxe, Jr., Coxe, Booker, Walls & Cobin, Wilmington, Del., Louis Waldman, Waldman & Waldman, New York City, of counsel, for defendant International.

Bruce M. Stargatt, Morford, Young & Conaway, Wilmington, Del., Abraham E. Freedman and Martin J. Vigderman, Freedman, Borowsky & Lorry, Philadelphia, Pa., of counsel, for defendant Local.

STEEL, District Judge.

Plaintiff, Trustee in Bankruptcy for Transit Freeze, a New Jersey corporation, relying upon § 303(b) of the Labor Management Relations Act of 1947, as

amended, 29 U.S.C. § 187(b), (the "Act") seeks to recover compensatory damages under the first cause of action, and punitive damages under the second cause of action from I.L.A. Local 1694 ("Local") and I.L.A., AFL–CIO ("International"). He alleges that injury to the property and business of Transit Freeze resulted from secondary activities, including a strike by members of defendants in violation of § 8(b)(4) of the Act, 29 U.S.C. § 158(b)(4).

Both defendants have moved to dismiss the Complaint upon the grounds of lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. Local 1694 alleged as an additional ground of dismissal that the action is barred by the statute of limitations and/or laches. The International denies that personal jurisdiction over it has been obtained. As an alternative to dismissal, the International has moved to strike certain parts of the Complaint.

■ Subject matter jurisdiction over the first cause of action clearly exists under § 303(b) for a violation of § 303(a) is alleged in paragraph 21 of the Complaint, and also in the following portion of paragraph 25 thereof:

"After members of Local 1694 unloaded the cargo of the S.S. Pipiriki on August 27, 1960, defendants continued until the present time * * * to threaten and coerce shippers, ship owners and ship agents to cease doing business with Transit Freeze * * *".

■ The remaining allegations of paragraph 25 fail to state a cause of action.[1] Whether proof of those allegations will be permitted at the trial can better be determined at a later stage of the case, possibly at pretrial.

■ The punitive damages claimed in the second cause of action are not recoverable under § 303 of the Act. Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964) so holds. The second cause of action will therefore be dismissed without prejudice to the right of plaintiff to file an amendment to the Complaint which will seek punitive damages under state law based upon federal "pendent jurisdiction". At the argument plaintiff indicated that such was his desire. The filing of such an amendment will, however, be without prejudice to defendants' rights to challenge its sufficiency.

■ The defense of limitations and/or laches is without merit. The general rule is that where there is no federal statute of limitations fixing the period in which suit may be brought to enforce a liability created by federal law, the period of limitations fixed by the law of the state in which the federal court sits will be applied. Cope v. Anderson, Receiver, 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947); Williamson v. Columbia Gas & Electric Corp., 27 F.Supp. 198, 203 (D.Del.), aff'd, 110 F.2d 15, 16 (3rd Cir. 1939), cert. denied, 310 U.S. 639, 60 S.Ct. 1087, 84 L.Ed. 1407 (1940). This principle has been applied where, as in the case at bar, damages were sought under § 303(b) for injury to property and business resulting from illegal secondary activity by a labor union. United Mine Workers of America v. Meadow Creek Coal Co., 263 F.2d 52 (6th Cir.), cert. denied, 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038 (1959).

1. They are:

"* * * to combine and conspire and to injure and destroy the business and property of Transit Freeze and to interfere with the contracts and business which Transit Freeze had with shippers, ship owners and ship agents and * * * and to contend before this Court, before the National Labor Relations Board, before the United States Court of Appeals for the Third Circuit, and to shippers, ship owners and ship agents that defendants were lawfully entitled to refuse to unload any ships with cargoes destined for the refrigerated rooms of Transit Freeze at the Marine Terminal, Wilmington, Delaware."

■ It will be assumed, without deciding, that as Local 1694 contends,[2] the two year period of limitation fixed by 10 Del.C. § 8106A for "injury to personal property" is the applicable statute. The cause of action is alleged to have arisen on August 23, 1960. Suit was not begun until September 3, 1964, more than four years later. However, Section 11, sub. e, of the Bankruptcy Act, 11 U.S.C. § 29, sub. e, provides:

"A receiver or trustee may, within two years subsequent to the date of adjudication or within such further period of time as the Federal or State law may permit, institute proceedings in behalf of the estate upon any claim against which the period of limitation fixed by Federal or State law had not expired at the time of the filing of the petition in bankruptcy. * * * "

The petition in bankruptcy was filed on August 10, 1962. At that time the two year statute of limitations had not expired. Transit Freeze was adjudged a bankrupt on September 5, 1962. The action was brought less than two years after that date. It was, therefore, timely by the express terms of § 11, sub. e, of the Bankruptcy Act.

The motion to strike paragraphs 22, 23 and 24 is denied, without prejudice to the right of defendants to later contend that proof of the facts therein pleaded should be excluded at the trial. What has been said in discussing the problem of subject matter jurisdiction likewise requires a denial of the motion to strike paragraph 25. There is no justification for striking paragraph 26. If the elements of loss therein alleged can be proved to have been proximately caused by the acts complained of, plaintiff is entitled to recover them. Since the second cause of action will be dismissed in its entirety, the motion to strike paragraphs 27 and 29 which are a part thereof is moot.

■ This leaves only the question whether personal jurisdiction over the International has been acquired. Service was purportedly made upon the International in Wilmington by handing to and leaving a true copy of the summons and complaint with Arthur Wilson, president of Local 1694. The Local concedes that this service gave the Court personal jurisdiction over it.

■ Section 301(d) of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185(d),[3] provides:

"The service of summons * * * of any court of the United States upon an officer or agent of a labor organization, in his capacity as such, shall constitute service upon the labor organization.[4]

The precise relationship required between a labor organization and another to make the latter an "agent" for the former, as the term is used in § 301(d) of the Act, is not discernible from the Act itself or from its legislative history. It is reasonable to assume, therefore, that Congress intended that general concepts pertaining to service of process should be the standard under the Act.

The decisions recognize that under some circumstances a Local may be an "agent" for a national or international union within the meaning of § 301(d) of the Act. Morgan Drive Away v. International Teamsters Union, 166 F.Supp. 885 (S.D.Ind.1958), aff'd, 268 F.2d 871 (7th Cir.), cert. denied, 361 U.S. 896, 80 S.Ct. 199, 4 L.Ed.2d 152 (1959); Isbrandtsen Co. v. National Marine Engineers' Beneficial Ass'n., 9 F.R.D. 541 (S. D.N.Y.1949); Daily Review Corp. v. In-

---

2. *Query*, whether the three year period for an "action based on a statute," 10 Del.C. § 8106, might not be controlling?

3. F.R.Civ.P. 4(d) (7) authorizes service in the manner prescribed by statute of the United States upon an unincorporated association which, like International, has been sued in its common name upon a

federal substantive right under Fed.R.Civ. P. 17(b).

4. While the return does not state that service was made upon either Wilson or the Local in his or its capacity as agent of the International, at the argument the International disavowed making any point of this fact.

ternational Typographical Union, 9 F. R.D. 295 (E.D.N.Y.1949). In each of these cases it was held that personal jurisdiction over the International had not been obtained by service upon the Local. In Isbrandtsen and Morgan Drive Away the Courts pointed out that whether service upon a Local constitutes service upon an International depends on the actual relationship between them. After reviewing the terms of the constitutions of the Internationals involved, the Courts concluded that the Locals were "autonomous" entities, and not agents.

In a somewhat analogous situation, it was held in Gainey v. Brotherhood of Railway and Steamship Clerks, etc., 177 F.Supp. 421 (E.D.Pa.1959), that service upon the Pennsylvania Railroad System Board of Adjustment constituted service upon the Brotherhood against the contention of the Brotherhood that the Board of Adjustment was autonomous and independent of the Brotherhood. Dismissal of the action upon other grounds was affirmed in 275 F.2d 342 (3rd Cir.) and certiorari was denied in 363 U.S. 811, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960).

The decisions are pretty well divided on the question whether service on an officer of a Local (as distinct from the Local itself) constitutes service on a National or International. In Farnsworth & Chambers Co. v. Sheet Metal Workers International Ass'n., 125 F.Supp. 830 (D. New Mex.1954) and Axel Newman Heating and Plumbing Co. v. Sheet Metal Workers' International Ass'n., 29 CCH Labor Cases ¶ 69,557 (D.Minn.1955), the Courts held that officers of the Locals who had been served were not agents of the International. By way of *dictum* the Courts stated that the Locals were "autonomous" bodies. In Axel the Court recognized that some degree of control is always retained by the National (or International) which charters a local union and that "the character of the affairs subject to supervision or regulation by the International must be weighted against the character of the affairs left to the local unions' discretion." In stating that the local unions were separate organizations or entities rather than mere branches, arms or agencies of the International, the Court attributed particular significance to the fact that broad powers of self-government and the right to enter into business transactions on their own behalf through their own representatives, were retained by the Locals.

A contrary conclusion was reached in Underwood v. Maloney, 14 F.R.D. 222 (E. D.Pa.1953); Operative Plasterers' and Cement Finishers' International Ass'n., 68 App.D.C. 43, 93 F.2d 56 (D.C.Cir. 1937) (neither of which involved the Labor Management Relations Act); and Claycraft Co. v. U.M.W., 204 F.2d 600 (6th Cir. 1953). In the latter case the Court, after considering the constitution of the International and the rules of the District, stated by way of *dictum,* that the District was not a separate autonomous entity but was part of the International and an agency through which it carried out certain of its work.

Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 148 F.2d 403 (4th Cir. 1945), held that although F.R. Civ.P. 17(b) authorized an action against an unincorporated association in its common name for the violation of a federally created right, this did not make impermissible a class action in its traditional form against the association. Accordingly, the Court held that effective service had been made upon the entire class of members of the association by service upon one Local and an officer of another Local, regardless of whether the service on the officer of the second Local was sufficient as service upon the Local itself. The Court indicated, however, that if suit had been brought against the association as an entity, as it might have been under F.R.Civ.P. 17(b), the service would have been adequate to subject the association to the Court's jurisdiction. This was because, in acting as bargaining agent for employees and in collecting funds in certain territories, the association had utilized its subordinate lodges and their officers.

In Spica v. International Ladies Garment Workers Union et al., 388 Pa. 382,

130 A.2d 468 (1957), service had been made upon the Secretary-Treasurer of the Joint Board (an aggregate of Loca's) at its headquarters in Philadelphia. The International was an unincorporated association with its main headquarters in New York. The question was whether service on the Secretary-Treasurer of the Joint Board constituted valid service on the International. This depended upon whether the International "regularly conducted business or association activity" at the office of the Joint Board in Philadelphia, within the meaning of Pennsylvania Rule of Civil Procedure, No. 2157 (a), 12 P.S. Appendix. The opinion contains an exhaustive review of the authorities, both state and federal, arising under § 301(d) of the Labor Management Relations Act, as amended, and other statutes and rules. The Court noted that the cases in other jurisdictions, and often within the same jurisdiction, "are irreconcilably split, and * * each case has been decided on its own merits," (130 A.2d at 474), and that the federal district court decisions "are far from uniform, each going off on its own facts." (130 A.2d at 475). The Court stated that it was not in accord with some federal cases such as Farnsworth & Chambers Co. v. Sheet Metal Workers International Ass'n., supra, and Isbrandtsen Co., Inc. v. National Marine Engineers' Beneficial Ass'n, supra, and concluded, with two dissents, that the service upon the Secretary-Treasurer of the Joint Board was adequate to give the Court personal jurisdiction over the International.

Regardless of the precise holdings of the various decisions, for the most part they recognize that whether a Local is an agent of an International for purposes of service of process depends upon the actual relationship between them. In the instant case, this relationship is shown by the affidavit of Gleason, the President of the International, the deposition of Wilson, the President of Local 1694, and the Constitution of the International. They disclose that:

The International is an unincorporated association. It is an international labor union consisting of over 80,000 members and over 300 local union and other affiliated bodies. Such membership and affiliated bodies are located in the United States and Canada, along the Atlantic seaboard from Maine to Florida, along the Gulf of Mexico from Florida to Texas, and along the coasts of the Great Lakes, and elsewhere.

The offices of the International consist of a President, an Executive Vice-President, a General Organizer, a Secretary-Treasurer, and 23 Vice-Presidents. From time to time the International has a President Emeritus. These officers constitute the International Executive Council which is the highest governing authority of the International between conventions. The International also employs Organizers who are its agents but not officers.

The objects and purposes of the International include, among others, the following:

"To promote the best interests of its members and their families; to organize the unorganized workers; to bargain collectively on behalf of workers within its jurisdiction, and to negotiate, make and administer collective agreements; to improve the wages and hours of work and to increase the job security and better the working and living conditions of all the workers employed within its jurisdiction; to secure and promote laws for the benefit of workers within its jurisdiction and labor generally; to promote health, welfare, pension, recreational and civic programs in the interests of its members and their families; to establish, maintain and operate clinics, hospitals, labor union halls and labor temples; and to do all things necessary and proper to carry out the foregoing objects and purposes." (International Constitution, Article IV)

The benefits which the International seeks to obtain for its 80,000 widely

dispersed members could not possibly be gained solely by its own activities in New York where its principal office is located. So vast a program as the objectives of the International envisaged, required implementation by other organizational units located throughout the far flung geographical areas over which it claimed jurisdiction. These were provided for in the Constitution of the International in the form of Districts, Locals and Local District Councils.

The International has three Districts: the Atlantic Coast District (covering the ports on the Atlantic Coast from Canada to Cape Hatteras, and on the St. Lawrence River), the South Atlantic and Gulf Coast District (covering the ports south of Cape Hatteras, and along the Gulf of Mexico to Texas), and the Great Lakes District (embracing all ports on the Great Lakes and on their tributary waters). Each of these Districts is under a duty "to do all things necessary and desirable to carry out the objects and purposes" of the International within its territory. (Article X, Sec. 3)

The over 300 Locals created by the International are composed of workers who are employed as longshoremen, clerks, checkers, marine carpenters and in other waterfront-connected jobs. The International has chartered three local unions in Delaware, each of which is located in Wilmington. They are: Local 1694, one of the defendants, consisting of longshoremen; Local 1883, consisting of clerks and checkers; and Local 1884, consisting of marine carpenters. All members of Locals are members of the International [4] and are subject to the jurisdiction of the International. (Article III)

A Local District Council is formed by Locals wherever two or more of them exist in any one port or locality adjacent thereto for the purpose of dealing with local matters affecting these Locals. (Article XI, Sec. 1)

The basic function of the Locals and the Local District Councils, like that of the Districts, is to effectuate the objects and purposes of the International. While no direct statement to this effect is found in the International Constitution, it is clearly implied in Article XX which makes the failure of a Local or a Local District Council to carry out the objects and purposes of the International, an event for which the International can in effect terminate its existence by creating a trusteeship for it.

No Local may be organized unless the International issues a charter to it. (Article XII, Sec. 1)

The International possesses supreme legislative, executive and judicial authority over all of its members, its Districts, its Locals and its Local District Councils. The International is the ultimate tribunal to which all matters affecting their welfare and that of their membership must be referred for adjustment and determination. (Article V, Sec. 2)

The specific powers of the International over its Locals are multitudinous and comprehensive. The International has the power to examine, inspect or audit all of the books, records, papers and accounts of a Local and can take possession of them for that purpose. (Article IX, Sec. 1) It collects from the Locals information showing the condition of the workers. It instructs the Locals how to keep accounts of their financial transactions and may require them to submit such periodic reports pertaining thereto as it specifies. (Article IX, Sec. 4) It places certain limitations on persons who may be admitted to membership in the Locals. (Article XIV, Sec. 3 and 4) The Locals are required to submit monthly a list of the names of its members to the International. (Article XIII, Sec. 7)

All initiation fees, dues, assessments and other monies paid to a Local and all books, records, property and assets in the possession of the Local, are the property of the International. A Local may retain and use them for its own benefit but only so long as the Local remains affil-

---

4. This was agreed to at the Argument.

iated with the International. If a Local is expelled or dissolved, reorganized, consolidated, secedes or withdraws from the International, all the books, records, funds, property and assets of the Local revert to the International. (Article XVI, Sec. 9)

Each Local is required to pay to the International quarterly per capita dues per member per month of an amount specified by the International. (Article XVI, Sec. 2)

No strike may be ordered except by the International. If a majority of the membership of a Local votes in favor of a strike, the Local may request the International to call one. If it consents, it orders the Local to quit work. (Article XXI, Sec. 1) In the event of an authorized strike, the International, upon application of the Local, may appropriate money out of the general funds of the International to assist members of the Local during the duration of the strike. Funds so appropriated by the International are forwarded to the officers of the Local for distribution. (Article XXI, Sec. 3)

A Local may fix its own wage scale unless it adversely affects other Locals or branches in the trade. But if there is more than one Local of the same craft in the same port, those Locals are required to cooperate in establishing a uniform wage scale and working conditions. If there is a dispute it is referred to the International and its decision must be accepted by the members of the Locals. (Article XXII, Sec. 2) [5]

Each Local is in certain respects autonomous. Each Local elects its own officers from among its members, fixes the number and kind of officers it shall have, provided only that there is at least a President, Vice-President, Secretary and Treasurer, fixes their salaries, and defines their power, duty and authority. Each Local deposits moneys paid to it in a bank account in its name or invests the money in Government securities. Authority to sign all checks drawn upon the account is vested in the Financial Secretary or Treasurer of the Local. The expenditure of moneys is made upon authorization of the Executive Board of the Local. Subject to minimum limits fixed by the International, the Local fixes the initiation fees and dues of its members. (Article XVI, Sec. 1) No member may be admitted to the International unless his application is filed with a Local and approved by it. (Article XIV, Sec. 1) The membership of each Local, acting at meetings, is the highest governing authority of such Local, and the Executive Board of each Local is the highest governing authority within the Local union between its meetings.

These aspects of independence of the Locals are, however, insignificant when compared with the important controls retained by the International. Any realistic evaluation of their relationship establishes that in truth and in fact the Locals are the instrumentalities by and through which the basic objectives of the International are carried out. Were the operations of the International confined to New York City, its membership would be inconsequential and its influence as an economic force would amount to little. It is only by means of its national and international activities in port areas that the benefits it seeks to accomplish for its membership are gained. These activities are carried out in important degree through its affiliated Districts, Locals and Local District Councils. The Constitution of the International, with complete accuracy, characterizes these affiliates as "subordinate bodies", (Article V, Sec. 2, Article XX, Sec. 2), and as "subdivisions"

---

5. In one instance, Moock, an International Vice President, told Wilson that he (Wilson) could not negotiate a separate contract for Local 1694 with the Philadelphia Marine Trade Association, the bargaining agent for employers in the Philadelphia port area, which included Wilmington. When Moock asked Wilson to sign the contract after it had been negotiated, Wilson refused. Moock said "Then I will have to sign it for you." (Depos. 71). The contract never was ratified by Local 1694 but it was bound by it.

of the International, (Article XII. Sec. 5, Article XIII, Sec. 3(b), Article XVIII, Sec. 1(b), Article XIII, Sec. 10, and Article XXVII, Sec. 22). The books, cards and blanks, which the International prints and furnishes the Locals upon their request is to enable them "to transact the business" of the International. (Article IX, Sec. 4)

 It is of no importance that the International sought to disavow in Section 10 of Article XIII of its Constitution any relationship of agency between itself and its Locals. Such a provision can have no effect if it conflicts with the provisions of law relating to service. Underwood v. Maloney, 14 F.R. D. 222, 226 (E.D.Pa.1953). See Board of Trade of City of Chicago v. Hammond Elevator Co., 198 U.S. 424, 437–442, 25 S.Ct. 740, 49 L.Ed. 1111 (1905). Furthermore, the mere fact that no member of Local 1694 was an officer, organizer or employee of the International does not deprive the service upon Local 1694 of its effect as service upon the International. See Bell v. Viavi Co., 4 W. W. Harr. 76, 143 A. 255 (Ct. in Banc. Del.1928), which held that personal jurisdiction might be obtained over a foreign corporation by service of process upon a domestic corporation when the foreign corporation was transacting business in Delaware through the domestic corporation as its agent. The fact that domestic corporation was an "independent company" with different officers and directors from the foreign corporation did not prevent the finding of an agency relationship between them. See also Szantay v. Beech Aircraft Corp., 237 F.Supp. 393 (E.D. S.C.1965).

The circumstances which gave rise to the case at bar illustrate the manner in which the International has used Local 1694 as an instrumentality to accomplish its purposes.

On April 1, 1960, Transit Freeze leased from the Board of Harbor Commissioners space at the Wilmington Marine Terminal for the purpose of constructing and operating refrigerated rooms for the storage and inspection of frozen meats and other foods. On August 22, 1960 the S. S. PIPIRIKI arrived at the Marine Terminal with a cargo of frozen meat destined for Transit Freeze. Prior thereto, the following arrangements had been made for unloading her: The owners of the PIPIRIKI had contracted with Norton-Lilly and Company, a firm of ship's agents, to make arrangements to discharge the cargo. Norton-Lilly, in turn, had contracted with Murphy-Cooke & Co., a stevedoring firm, to have the cargo discharged from the PIPIRIKI's hold onto the dock alongside the vessel. Murphy assigned this work to longshoremen who were members of Local 1694. The Board of Harbor Commissioners had given the work of coopering and moving the meat from shipside to the storage area of Transit Freeze to Local 107 of the Teamsters Union with which the Board had a lawful collective bargaining agreement. As a political subdivision of Wilmington and the operator of the Marine Terminal, the Commissioners had reserved to themselves the right to assign this work as it pleased.

The present controversy arose out of the efforts of the International to obtain for the membership of its Local 1694 the work which the Board of Harbor Commissioners had assigned to Local 107 of the Teamsters Union. '

According to the Complaint, between June of 1960 and August 23, 1960, Moock, a Vice President of the International came to Wilmington on five occasions to see Wilson, president of Local 1694, about obtaining for its members the work of moving cargoes of frozen meat from the dock into the refrigerated rooms of Transit Freeze, together with the coopering work incident to the inspection by the Government. During these visits Moock told either Cathcart, the general manager of the Marine Terminal, or Melvin, the vice president and treasurer of Transit Freeze, or both of them, in the presence of Wilson, and on occasion others, that unless the members of Local 1694 were given the work they would not unload ships carrying cargoes destined for Transit Freeze. On another occasion dur-

ing this same period, according to the Complaint, Carter, a vice president of the Atlantic Coast Division of the International, came to Wilmington and told Cathcart, in the presence of Wilson, that he (Wilson), was under instructions from Moock not to work the ships with cargoes for Transit Freeze, and that specific instructions had been given to members of Local 1694 to this effect. Furthermore, the Complaint alleges that on August 23, 1960, Moock telephoned Hughes, the manager of Norton, Lilly & Company, and told him he was not allowing the members of Local 1694 to unload the PIPIRIKI which by that time had arrived at the Wilmington Marine Terminal.

The views of Local 1694 and those of the International apparently differed as to desirability of the strike. Wilson testified that he did not want Local 1694 to strike the PIPIRIKI and that he told Moock "Now, if you want this ship tied up, then you are going to have to tie it up. I'm not going to tie the ship up. You tie it up. You give the word. Not me." (Depos. 37). When Carter told Wilson that the ship was not going to be worked, Wilson replied, "You are taking it upon yourself. I am not going to do this." Wilson testified that if Carter hadn't given him the order not to work the ship, he would have gone to work. He said that the Constitution required him to follow the order. (Depos. 38). Wilson looked upon Carter's acts as those of the International, and said that any time Carter said something to him "I think it is coming from Headquarters, and I think he is bringing a message from Gleason", the President of the International. (Depos. 73–74).[6]

Whether service could have been made upon the International through Local 1694 in an action based upon a wrong committed by the Local independently of any direction by the International, is not in issue. Such a question would be presented if the International had been sued by a person injured by a strike called by the Local without the consent of the International. Here, the case is one in which the International, through one of its vice presidents, and a vice president of one of its divisions, entered Delaware on a number of occasions and directed Local 1694, contrary to its wishes, to strike the PIPIRIKI in order to obtain additional work for its members. In so doing, the International was unquestionably carrying on activities in Delaware, through the intermediation of Local 1694, for the purpose of attaining one of its important objectives, and those activities of the International were the genesis of the present suit.

The relationship between the International and Local 1694 was such that it would be reasonable to expect that the service of process upon the Local directed to the International would be brought to the attention of the International by the Local. The Courts have recognized this to be an important factor in determining whether personal jurisdiction over an International has been obtained when process directed to it has been served upon an officer of a Local or other subordinate body. Claycraft Co. v. U.M.W., supra, 204 F.2d at 603, Operative Plasterers' and Cement Finishers' International Ass'n v. Case, supra, 93 F.2d at 65, Spica v. International Ladies Garment Workers Union, supra, 130 A.2d at 476. See also Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, supra, 148 F. 2d at 406. Furthermore, the International had sufficient contacts in this jurisdiction in connection with the subject matter of this suit to make it reasonable and just according to our traditional conception of fair play and substantial justice, to permit this Court to enforce against it the claims which the Complaint alleges. Accordingly, there can be no

6. Initially, on his direct examination, Wilson had testified that he did not consider the instructions which he received from Carter as an order coming from the International. The fair inference from all testimony, is, however, that the order to strike the PIPIRIKI did emanate from the International, and Carter, as vice president of its Atlantic Coast Division, was simply the means by which the order was communicated to the Local.

constitutional objection to requiring the International to submit itself personally to the jurisdiction of this Court. International Store Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Since service on Local 1694 constituted valid service upon the International, it is unnecessary to determine whether Wilson in his individual capacity was an agent of the International under § 301(d) of the Act.

It is also unnecessary to determine whether Local 1694 or Wilson was an agent within the meaning of F.R.Civ.P. 4(d)(3).

Let an Order be submitted in accordance with this opinion.