Robert **HECK, Robert Sullivan, James Hoff, Earl Hardbarger and Paul Brown, Plaintiffs,**

v.

**C.H. HEIST CORPORATION, International Brotherhood of Painters and Allied Trades and Painters Local Union No. 1144, Defendants.**

Civ. A. No. 84–A015.

United States District Court,
S.D. West Virginia,
Parkersburg Division.

May 21, 1986.

George Zivkovich, Parkersburg, W.Va., for plaintiffs.

Stanley M. Hostler, Charleston, W.Va., for Painters Local 1144.

Fred L. Davis, Jr., Davis, Bailey, Pfalzgraf & Hall, Parkersburg, W.Va., for C.H. Heist Corp.

William H. Bruckner, Alaniz, Bruckner & Sykes, Houston, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

This action by five employees (Plaintiffs) of the C.H. Heist Corporation is brought under Section 301 of the Labor-Management Relations Act of 1947, 29 U.S.C. § 185. The employees sue their employer for breach of a collective bargaining agreement; they also sue their international and local unions for an alleged violation of their duty to provide fair representation. Both unions have moved the Court for dismissal.

The International Brotherhood of Painters and Allied Trades (the International) bases its motion on a service of process issue. It claims that service on an official of the local in Parkersburg, West Virginia, was not effective against its Washington, D.C., based operations. Painters Local Union No. 1144 (the Local) moves for dismissal, or, in the alternative, summary judgment in its behalf, on the ground that it was not a signatory or party to the collective bargaining agreement governing the five employees.

### I. *Background*

Robert Heck, Robert Sullivan, James Hoff, Earl Hardbarger and Paul Brown were employed by the C.H. Heist Corporation (Heist) out of the company's Marietta, Ohio, office. The five worked under a collective bargaining agreement negotiated between the Defendant International and Heist. They were also members of the International's Local based in Parkersburg.

In February of 1983, the Plaintiffs were assigned to a project at the Washington, West Virginia, plant of E.I. duPont de Nemours & Company, which had contracted for industrial cleaning services to be provided by Heist. The work took place in the evenings over a two-day period: February 16 and 17. On those two days, the five-man crew worked in and around a computer room cleaning overhead vents and ducts and the space between a false floor and the actual floor. They were observed on the first day by an employee of duPont. This employee, Michael Bartimus, submitted a memo to his superiors reporting his impressions of the allegedly lackadaisical performance by the Heist crew. Especially singled out by Bartimus was the extended meal and coffee breaks taken by the crew. Bartimus would also testify at a later arbitration hearing that six weeks after the Heist cleaning he and another

duPont employee would have to remove a "tremendous amount of dirt and dust" from beneath the false floor.

Having received Bartimus' memo on the work habits of the Plaintiffs, the duPont purchasing agent responsible for contracting services notified Heist officials. The local Heist officials in turn relayed the complaints of duPont to C.R. Heist. Mr. Heist was quite concerned about the displeasure of the company's then largest client. The concern was magnified by the company's recent financial difficulty and the loss of a larger client, the Monsanto Company, the prior year.

Mr. Heist met with officials of duPont on March 1, 1983. At the meeting, the duPont officials pressured Mr. Heist about the action to be taken against the Plaintiffs. Other incidents on Mr. Heist's mind at that time were that employees whose passes to duPont's premises had expired were not issued new permanent passes, as had been routinely done before, but were given only temporary passes, and that duPont had not yet renewed the work contract as it normally occurred. Fearful of losing the duPont account, Mr. Heist decided to discharge the Plaintiffs. This action was favorably received by duPont. Permanent passes were then issued to Heist employees.

At the time the decision to discharge was made, Mr. Heist was unaware of the prior disciplinary records of the five employees. He also ignored a point system for discipline established by the collective bargaining agreement.

The five employees filed grievances disputing the duration of breaks reported in the Bartimus memo. An arbitrator was selected to hear the employees' requests for reinstatement.

During arbitration it was the company's position that there was cause for discharge under the labor agreement because the grievants were *persona non grata* at duPont on account of their work performances. The arbitrator disagreed that the *persona non grata* doctrine applied. He did not find a clear and persuasive showing that duPont had demanded that the employees be fired. He found that duPont had merely wanted some action taken. The arbitrator then concluded that the charges against the Plaintiffs, taken at their worst, did not under the disciplinary point system justify termination. The arbitration award entered on August 3, 1983, ordered reinstatement of the Plaintiffs with back wages and without loss of seniority or other benefits.

The Plaintiffs allege that upon returning to work for Heist they were not permitted to work at the duPont Washington Works plant. They also allege that they have not received the back wages specified in the arbitrator's decision, and that they were bypassed on the seniority list regarding work available at other plants serviced by Heist. The Plaintiffs thus filed a second grievance on September 27, 1983.

In November of 1983, the Plaintiffs formally received notice from Heist and the Local that they would not be permitted to work at duPont's Washington plant, and that the arbitrator's award of August 3, 1983, and the second grievance of September 27, 1983, would only be applicable to other plants. The Defendant Local appears to have acquiesced in this decision. Meanwhile, the arbitrator's second decision, entered July 25, 1984, provided a formula for calculation of all back wages and other benefits and directed the Plaintiff's reinstatement with full seniority rights. The award, however, also determined that Heist did not breach the collective bargaining agreement by refusing to assign the Plaintiffs to work at the duPont Washington plant.

This action, filed on February 2, 1984, was brought before issuance of the arbitrator's second decision. The unamended complaint of the Plaintiffs is consequently somewhat dated.

## II. *Discussion*

### A. *The Local Union As A Proper Party*

■ The Local argues that it is not a proper party to this litigation as it was neither a party nor a signatory to the labor

agreement signed by Heist and the International. The Local's legal argument stems from the same statutory section which authorizes the Plaintiffs' action, Section 301 of the National Labor-Management Relations Act of 1947. 29 U.S.C. § 185.[1] A claim under Section 301 must generally meet three rudimentary requirements before it may be asserted in federal court: (1) a claim of violation of (2) a contract (3) between an employer and a labor organization. *Carpenters Local Union No. 1846 v. Pratt-Farnsworth*, 690 F.2d 489, 502 (5th Cir.1982), *cert. denied* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). The Local argues that the "labor organization" required for a Section 301 claim is in this instance the International, not the Local.

The D.C. Circuit addressed this very issue in *Blake Construction Company, Inc. v. Laborers' International Union of North America*, 511 F.2d 324 (D.C.Cir. 1975). The locals in *Blake* were refusing to arbitrate under a labor agreement signed only by the international union and the employer. The court looked beyond the formalities of the signatures and scrutinized the realities of industrial relations in general and in the situation before it. The court noted that the labor agreement "obviously intended to cover relationships other than those between its signers." *Id.* at 330. It also found that it was "manifestly unreasonable to assume that Blake or any other employer contemplated a collective bargaining agreement that did not mutually obligate parties with whom Blake would be dealing directly to abide by its terms." *Id.* Evidence of the realities involved was found in the preamble of the labor agreement. It contained words to the effect that the contract was entered into by the international for and on behalf of its local unions. *Id.* at 329. In thus looking at the substance instead of the form of the labor relationships, the *Blake* court held that the local unions were compelled to arbitrate under the terms of the labor agreement.

The Court of the Southern District of West Virginia has also had two occasions to consider the liability of local unions under labor agreements signed only by the parent international union. Judge Hall, writing in *Consolidation Coal Co. v. United Mine Workers, Local Union No. 6869*, 362 F.Supp. 1073 (S.D.W.Va.1973), held that although a local union was not a signatory to the labor agreement, the law could not be construed so as to insulate the local union from liability and obligations thereunder. *Id.* at 1076.

A similar holding can be found in *Central Appalachian Coal Co. v. UMWA*, 376 F.Supp. 914 (S.D.W.Va.1974). In finding a "multi-party relationship" to exist, the court there held that the local union was covered by the labor agreement though it purported to only be between the international union and the employer. The court reasoned that it was "at least open to proof that the parent international was acting as agent, in fact, for not only the individual members but also its local and district subdivisions in negotiating the contract." *Id.* at 921. The *Central Appalachian* court cited a number of cases as supporting the proposition that local unions may be obligated under the terms of a collective bargaining contract negotiated by a parent international union, and may be amenable to suit under Section 301 of the LMRA for violations, even though the local unions were not formal parties to the agreement.[2]

---

**1.** Section 301(a) of the Act provides as follows: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

**2.** *Roadway Express, Inc. v. General Teamsters, etc., Local 249*, 330 F.2d 859 (3d Cir.1964); *Sidney Wanzer & Sons, Inc. v. Milk Drivers Union, Local 753, et al*, 249 F.Supp. 664 (N.D.Ill.1966); *United States Steel Corp. v. United Mine Workers of America*, 320 F.Supp. 743, 746 (W.D.Pa.1970); *United States Steel Corp. v. United Mine Workers of America*, 77 L.R.R.M. 3134, 3135 (E.D.Ky. 1971); *Consolidated Coal Co. v. United Mine Workers of America, Local 6869*, 362 F.Supp. 1073 (S.D.W.Va.1973).

The Defendant Local, on the other hand, cites four cases as supporting its position. *Teamsters Local No. 30 v. Helms Express, Inc.,* 591 F.2d 211 (3d Cir.1979), *cert. denied,* 444 U.S. 837, 100 S.Ct. 74, 62 L.Ed.2d 48 (1979); *Fox v. Mitchell Transport, Inc.,* 506 F.Supp. 1346 (D.Md.), *affirmed,* 671 F.2d 498 (4th Cir.1981); *Sine v. Local No. 992, International Brotherhood of Teamsters,* 730 F.2d 964 (4th Cir.1984); and *Carpenters Local Union 1846 v. Pratt-Farnsworth, Inc.,* 690 F.2d 489 (5th Cir.1982).

The *Pratt-Farnsworth* case is significant for the theory that was pursued by the plaintiff unions. In a Section 301 suit, the unions tried to keep in as defendants two associations of general contractors. Unlike the Plaintiffs in the case *sub judice,* the unions conceded that the two defendants were not contractually bound by the labor agreement since they had not signed it. Rather, the unions argued that a cause of action was stated under Section 301 if there was merely a violation of a labor contract. They submitted that the defendants had conspired to violate the labor contract. The court rejected the union's arguments. It held that there had to be a contractual relationship between the unions and the parties sued under Section 301.

Two fundamental differences between this case and the *Pratt-Farnsworth* case are apparent. First, the unions in *Pratt-Farnsworth* were trying to bring in as defendants parties whose nexus to the contract was admittedly weak. In this case, the Plaintiffs attempt to bring in an entity whose association with the parties and the contract is one of intimacy. Second, while the unions in *Pratt-Farnsworth* pursued a theory novel in its interpretation of Section 301 requirements, the Plaintiffs here base their claim against the Local upon the ground that it was in truth a party to the contract.

The other three cases cited to the Court by the Defendant are a bit unusual in that the Eastern Conference of Teamsters was involved in all three. Plaintiffs in each case attempted to sue the Conference although it was not a party to any of the collective bargaining agreements involved. Of the three, the *Sine* case is of special note to this Court for two reasons: It is a recent Fourth Circuit precedent, and it frames the issue in a context made appropriate by the Supreme Court's recent decision in *Carbon Fuel Company v. Mineworkers,* 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979).

In *Carbon Fuel Company* the Supreme Court held that an international union's liability for the acts of its locals must be governed by a common-law agency test. An international union would have to either "instigate, support, ratify or encourage" a local's act to incur liability. It would not be technically correct to declare the *Carbon Fuel Company* decision as establishing a new agency test for union liability. The Court was merely applying the common-law agency test adopted by Congress in Section 301(e). *NLRB v. Local 3, International Brotherhood of Electrical Workers,* 730 F.2d 870, 876 (2d Cir.1984). Still, the decision seems to heighten the consciousness of the courts to the question of agency when dealing with the enter-entity liability of unions, as evidenced by the opinion in *Sine.*

The *Sine* court was faced with the issue of "making an exception to the general rule" by holding the Conference vicariously liable on the contract entered into by the local and a national bargaining committee of the international union. The Conference, a regional organization of locals, had provided a lawyer to assist two employees (plaintiffs) who had filed a grievance. Employees of the conference also sat on an employer-union committee which heard the grievances. The *Sine* plaintiffs cited those two particulars in support of their argument that the Conference, together with the local, should be held liable for failing to properly represent them. The court refused to hold the Conference liable. Citing *Carbon Fuel Company,* the court noted the Supreme Court's recognition in that case of the care taken by Congress "to construct a shield that limits an international union's legal responsibility for the

acts of one of its locals." *Sine* at 966. Turning to the common-law agency test, the court dismissed as irrelevant the fact that Conference employees had served on the joint committee. "Their function on the committee was to decide grievances, not to prosecute them." *Id.* As for the assistance of the lawyer, the court did not find such to create "an agency relationship which would make the conference liable." *Id.*

Although the decision in *Carbon Fuel Company* as well as in *Sine* was based on attempts to impute liability up the union hierarchical ladder, the holdings would appear to be no less applicable to the case at hand where the opposite is attempted. Indeed, the language of Section 301(b) does not discriminate: "Any labor organization ... shall be bound by the acts of its agents." Therefore, although the earlier cited cases from this District and the D.C. Circuit are directly on point and considerably helpful, it must be noted that those cases were decided before *Carbon Fuel Company.* Hence, they cannot be followed with impunity.

In *Carbon Fuel Company,* the Court was concerned with imputing liability to the national union for a wrongful activity— wildcat striking. The Court looked to the circumstances surrounding that event to determine agency. The Court did not consider other relationships the local and international might have; it placed emphasis on the nexus of the parties to a particular event.

■ Here, the question is whether the Local may be considered a party, together with the International, to the collective bargaining agreement. So, the focus should be on the contract. A general principle of contract law provides that a court may examine the performance of a contract by the parties to determine what their intent was in entering into the contract. In this case, the intent centers on who was to be a party to the contract.

The genesis for this inquiry is provided by the preamble to the collective bargaining agreement. The agreement states that it is entered into by Heist and the International "for itself and on behalf of its subordinate Local unions...." The agreement does not appear to be national in scope. This conclusion is supported by Schedule B of the agreement which establishes that the agreement covers only three offices of Heist and that the designated local union of those offices' employees is identified as Local Union No. 1144. These two facts would tend to compel a conclusion that the Local be considered a party to the agreement.

More than the bare verbiage of the agreement, however, supports the proposition that the Local should properly be considered a party to the collective bargaining agreement. For example, there is also the uncontroverted allegation by the Plaintiffs that Local officials were present at the negotiating sessions which produced the agreement. Moreover, when the Plaintiffs filed their grievance pursuant to the terms of the agreement, they filed it with the Local, and not the International. This action might seem immaterial given that a worker might be conditioned to turn to his local union regardless of which level of the union hierarchy was contractually responsible, but in this instance, the Local immersed itself in the grievance and arbitration process. By his admission, Harold Stephens, business representative of the Local, processed the Plaintiffs' grievances pursuant to Section 1 of Article XXII of the Agreement after their March 2, 1983, discharge. He earlier helped them file the grievances. Although Stephens states that he turned the grievances over to S. Frank Rafferty, General President of the International, after he was unable to resolve them at the local level, the record reflects that Stephens continued to be involved in the process. Stephens assisted in preparing the Plaintiffs' cases for arbitration; he also met several times with the Plaintiffs and Heist representatives in efforts to resolve the back pay issues.

In support of its position that it is not a party to the collective bargaining agreement, the Local points out that it is not a

signatory, that the collective bargaining agreement was not submitted to the Local for its approval or ratification and that it was not a "party" to the arbitration opinion and award. The Court considers these facts to be merely of a formal or technical significance. The Court cannot ignore the reality of the relationship between both the union entities and the Heist corporation. This reality is manifested by correspondence from the International's president in which he indicated that the Local would be expected to pay the union's half of the arbitration costs.

The conclusion that the Local is in fact a party to the collective bargaining agreement does not in any way prejudge its liability to the Plaintiffs'. It appears that the Local and the International were acting as partners in the grievance and arbitration process. The liability of either entity, however, remains to be developed. Moreover, for the acts of one entity to be imputed to the other, the common law agency test must be met.

For the foregoing reasons, the Court deems it just and proper that the Local be continued as a party to this litigation.

B. *Service of Process on the International*

The Defendant International challenges the sufficiency of the service of process as such relates to itself. The record reflects that service of the summons and complaint was made on Harold Stephens in Parkersburg, West Virginia. As noted, Stephens is the business representative for the Local. He received copies of the summons and complaint on behalf of both the International and the Local. The International contends that Stephens was not authorized to receive service of process for the International—that is, that he was not its agent.

Agency is the key concern here because of the wording of Section 301(d) of the National Labor-Management Relations Act.

"The service of summons, subpoena, or other legal process of any court of the United States upon an officer *or agent* of a labor organization, in his capacity as such, shall constitute service upon the labor organization."

29 U.S.C. § 185(d) (emphasis added); *see also Rule* 4(d)(3), Federal Rules of Civil Procedure. Section 301(e) of the Act in turn determines what or whom constitutes an agent of a labor organization. The latter section has been construed as incorporating general common law principles of agency. *Bacino v. American Federation of Musicians of United States and Canada,* 407 F.Supp. 548, 553 (N.D.Ill.1976).

■ Whether an agency relationship existed between the Local and the International so as to validate the service of process must be determined by reviewing the actual relationship between the two entities. *Kreshtool v. International Longshoremen's Association,* 242 F.Supp. 551, 556 (D.Del.1965). A vital area of inquiry is whether the two entities are autonomous. *Hardison v. Trans-World Airlines,* 375 F.Supp. 877, 880 (W.D.Mo.1974), *affirmed,* 527 F.2d 33 (8th Cir.1975), *reversed on other grounds,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). If the affiliate, the local union, can be said to lack "significant control" over its own affairs, then an agency relationship may be found. *Bacino, supra.* Of course, the mere fact of affiliation will not create a presumption of agency. *Id.* Courts have traditionally examined the constitution and the bylaws of the two entities to ascertain the degree of control exerted by one over the other. The constitution of the International and the bylaws of the Local have been made a part of the record here.

Turning to the constitution and the bylaws applicable to the parties, the Court notes with approval the *Bacino* court's balancing test which weighs those "matters left to the control and discretion of the local against those matters which remain under the control of the national." *Id.* at 554. The Plaintiffs, in referencing the International's constitution, have identified a number of features which suggest that the Local had an agency relationship with the International.

Foremost, the Plaintiffs note the premise found at the beginning of the constitution that the Brotherhood is comprised of an unlimited number of local unions and other subordinate bodies. In this vein, the constitution requires that a Local apply to the International for a charter. Further, all bylaws of a local must be submitted to the International for its approval and cannot conflict the constitution.

The Plaintiffs also make much of the power and authority posited in the General Presidency of the International. The General President is charged with directing and supervising all subordinate bodies of the Brotherhood. His interpretation or construction of the constitution is binding upon all subordinate bodies. A refusal by a local to obey an order of the General President may result in the revocation of the local's charter. The General President can also revoke the charter of a local for violating the constitution. The General President has the authority to visit any locality for the purpose of adjusting strikes and working out grievances and difficulties between unions and individual members. The General President also has the power, with or without a hearing, to take control of a local union and its affairs for, *inter alia*, correcting corruption and mismanagement and restoring democratic procedures.

The general executive board of the International likewise has much power in dealing with the locals. It may enter into agreements without the ratification of the membership. It has the power to examine the books and accounts of all local unions. It has the authority to order the immediate removal of financial officers of subordinate bodies. While the locals do have the authority to negotiate agreements with employers, they must submit them to the general executive board for approval. The board may refuse to approve agreements which do not contain language specified in the constitution. Finally, if a local's charter is suspended or revoked and the local is not reorganized within a period of two years from the date of revocation or suspension, then all funds, assets and other properties become the property of the International.

A review of the Local's bylaws reveals a scheme under which the Local maintains its control over the less significant day-to-day operations of the Local. The Local's place in the scheme of things is reflected in an acknowledgment, contained in the Local's bylaws, that the International's constitution supersedes any provision of the bylaws which are inconsistent with the constitution.

Despite the above, the Court finds that the Local enjoys some degree of autonomy in the carrying out of its functions. It maintains its own books and accounts, it is registered with various agencies of the United States and the State of West Virginia in its own name. The Local also asserts that it is solely responsible for and files in its own name reports required by federal and state agencies. The Local elects its own officers, albeit according to the International's guidelines. Such officers direct the activities of the Local.

Nevertheless, having reviewed the constitution of the International, the bylaws of the Local and the other evidence of record, the Court is convinced that the two entities here, the International and the Local, do enjoy a symbiotic relationship. That this relationship arises to the level of agency, within the meaning of the rules governing service of process, is buttressed by their conduct with regard to the situation at hand.

The Plaintiffs bring to light communications from General President S. Frank Rafferty to William Bruckner, attorney for Defendant Heist, and from Rafferty to Harold Stephens. Excerpts from these letters illustrate the degree to which the International was using Stephens and the local union to accomplish its goals.

"It is my understanding that efforts are underway to resolve these grievances between by Special Assistant Welch, Business Representative Stevens [sic], C.H. Heist III and yourself. In the event these discussions do not resolve the grievances, I respectfully request that

these grievances be submitted to an arbitrator."

March 9, 1983, letter from Rafferty to Bruckner.

"I would recommend that you begin to develop your case to be presented to the arbitrators."

March 25, 1983, letter from Rafferty to Stephens.

"Please study the list of arbitrators and advise this office at the earliest possible of which arbitrator is your first, second, third, fourth and fifth choice to be selected and we will attempt to designate your selections."

April 5, 1983, letter from Rafferty to Stephens. Stephens communicated his choice of arbitrators to Rafferty by a letter dated April 7, 1983.

"You will be responsible for making sure the witnesses are present and your attorney is available to present the cases."

May 10, 1983, letter from Rafferty to Stephens.

"Upon receipt of the payroll information from C.H. Heist Corp. required to resolve the grievance, the information will be forwarded to you in order to verify with all interested parties the settlement due each grievant.

\* \* \* \* \* \*

Please keep this office advised as to whether or not C.H. Heist Corp. did implement the arbitrator's award and if the grievants were permitted to work at du-Pont Washington Works."

November 16, 1983, letter from Rafferty to Stephens.

The *Bacino* court noted that the particular involvement of the International level in a dispute may be sufficient to warrant a finding of agency. In that case, there was no suggestion "that the International in any way aided, participated, encouraged, condoned, ratified, or even knew of the Local's action." *Bacino*, 407 F.Supp. at 555. The converse is certainly true here.

The evidence shows that the International worked hand-in-hand with the Local and Harold Stephens, and greatly utilized its affiliate in providing representation to the Plaintiffs. The provision in the Local's by-laws disavowing an agency relationship between it and the International is of no effect when the reality of the relationship is apparent.[3] *See Kreshtool*, 242 F.Supp. at 559.

In support of its motion to quash the service of process, the Defendant International cites and extensively relies upon the case of *Central Operating Co. v. Utility Workers of America, AFL–CIO*, 491 F.2d 245 (4th Cir.1974). The holding of that case is inapposite to the issue now before the Court. In *Central Operating* an action was filed against an international union in a federal district court in West Virginia. An agent of the international was served in Ohio. As the court acknowledged, the issue was not the proper agent for receipt of process upon the union but, rather, where that agent could be served. The court was thus construing *Rule* 4(f), the rule dealing with extra-territorial service of process, not *Rule* 4(d)(3), the rule now before this Court. The case, insofar as it supports the International, merely stands for the general proposition that a court must acquire personal jurisdiction over a labor organization pursuant to a federal statute or rule.

In consideration of the foregoing, the Court concludes that the International was served properly through its agent, the Local, and, therefore, the Court will deny the motion of the Defendant International to quash the service of process.

**C.  *Effect of the Second Arbitration Decision***

■ In its renewed motion for summary judgment, the Defendant Local raises a new ground why judgment should be entered in its favor. It argues that the arbitrator's supplemental decision, issued on

---

**3.** The Court is not dissuaded by Stephens' averments that neither he nor any other Local representative was authorized to settle the grievances prosecuted by the Plaintiffs. This evidence is outweighed by other evidence of the active role played by Stephens and the Local.

July 25, 1984, resolved all the issues raised by the Plaintiffs in this action. Hence, it concludes that this action is moot. The Plaintiffs disagree. The Court finds that only a portion of the action has been mooted.

The two-count complaint filed by the Plaintiffs can be parsed into three general grievances. First, the Plaintiffs contend that they have not received back wages pursuant to the August 3, 1983, arbitration award; second, that the Plaintiffs have not been reinstated with full seniority rights; third, that the Plaintiffs have not been allowed to work at the duPont plant. As to the final item, the Plaintiffs accuse the three Defendants of conspiring together to nullify the arbitrator's award and to violate the collective bargaining agreement. This accusation coupled with the Defendant union's alleged failure to prosecute the Plaintiffs' September 27, 1983, grievance, constitutes the basis for the Plaintiffs' claim that the unions have violated their statutory duty of fair representation.

Upon a review of the arbitrator's second decision, the Court concludes that it does moot the Plaintiffs' complaint of not being permitted to work at the duPont facility. The arbitrator, having received further evidence on the issue, decided that the Plaintiffs were indeed *persona non grata* at duPont. Therefore, his amended award excepted work at duPont from the Plaintiffs' back pay entitlement and future work assignments. The Plaintiffs were represented by counsel at the arbitration hearing and agreed to be bound by the result. The Court finds no basis to upset the presumed finality of the arbitrator's decision with respect to the duPont work assignment issue.

In his supplemental decision, the arbitrator set forth a formula by which the parties were to calculate the Plaintiffs' back pay. The Plaintiffs have alleged that they have not received any of that pay. The Defendants represent that a sum of money has been paid over to the Plaintiffs. It appears that the Plaintiffs yet contest the amount to be paid pursuant to the arbitrator's decision. On the present record, the Court cannot resolve the competing assertions of the parties. Hence, it defers ruling on this portion of the Local's motion.

Finally, the Plaintiffs argue that their second grievance, dated September 27, 1983, was never arbitrated as it pertained to the Plaintiffs being bypassed for work at plant sites other than the duPont Washington Works plant. Without intimating a position on the merits, the Court agrees with the Plaintiffs. The arbitrator did not address this issue in his supplemental decision. Therefore, if the Plaintiffs' allegations are true, Heist may be in violation of the collective bargaining agreement for failing to abide by the terms of the first arbitration decision and the unions, in failing to prosecute the grievance in this respect, may have violated their duty of fair representation. Accordingly, the Court will deny the Local's summary judgment motion on this point.

### III. *Conclusion*

In accordance with the above reasoning, the Court ORDERS as follows:

1. That the International's motion to quash service of process and dismiss the complaint is denied;

2. That the Local's motion to dismiss the complaint is denied;

3. That the Local's motion for summary judgment with respect to the Plaintiffs' request for reinstatement to the work force eligible for assignment to duPont's Washington Works plant is granted, in all other respects it is denied; and

4. That on the Court's own motion summary judgment is entered in favor of Heist and the International on the duPont work assignment issue.

The Clerk is directed to send a certified copy of this Memorandum Opinion and Order to counsel of record.